IN THE UNITED STATES COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| JANET BUTLER, | ß | |
| | ß | |
| Plaintiff, | ß | |
| | ß | |
| V. | ß | CIVIL ACTION NO. H-07-3667 |
| | ß | |
| MICHAEL J. ASTRUE, | ß | |
| COMMISSIONER OF THE SOCIAL | ß | |
| SECURITY ADMINISTRATION, | ß | |
| | ß | |
| Defendant. | ß | |

**MEMORANDUM AND ORDER DENYING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT AND GRANTING PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT**

Before the Court in this social security appeal is Plaintiff's Motion for Summary Judgment (Document No. 11) and Defendant's cross Motion for Summary Judgment (Document No. 13). After considering the cross motions for summary judgment, the administrative record, the written decision of the Administrative Law Judge, and the applicable law, the Magistrate Judge ORDERS, for the reasons set forth below, that Defendant's Motion for Summary Judgment is DENIED, Plaintiff's Motion for Summary Judgment is GRANTED, and this matter is REMANDED to the Commissioner of the Social Security Administration for further proceedings.

**I. Introduction**

Plaintiff Janet Butler ("Butler") brings this action pursuant to Section 205(g) of the Social Security Act ("Act"), 42 U.S.C. ß 405(g), seeking judicial review of an adverse final decision of the Commissioner of the Social Security Administration ("Commissioner") denying her

application for disability insurance benefits. Butler argues that substantial evidence does not support the Administrative Law Judge's ("ALJ") decision and that the ALJ erred: (1) because he did not provide "good reason" under the regulations for rejecting the treating source opinion regarding the severity of Mrs. Butler's alleged disabilities, including her functional capacity assessment; (2) because he failed to "develop the record fully and fairly" by re-contacting Dr. Stein and Dr. Goodine as required by the Appeal's Council Order of Remand; and (3) failed to comply with the order of the Appeals Council in obtaining an appropriate medical expert. The Commissioner, in contrast, argues that there is substantial evidence in the record to support the ALJ's findings and his disability decision, that the decision comports with applicable law, and that it should therefore be affirmed.

## II. Administrative Proceedings

On April 12, 2005, Butler filed her claim for Social Security Disability Insurance Benefits (SSDI), claiming that she has been unable to work since April 15, 1998, as a result of her chronic obstructive pulmonary disease (COPD), hypertension, and asthma. (Tr. 19, 58, 85). The Social Security Administration denied her application at the initial and reconsideration stages. After that, Butler requested a hearing before an ALJ. The Social Security Administration granted her request and the ALJ, Donald J. Willy, held a hearing on April 25, 2006, at which Butler's claims were considered *de novo*. (Tr. 34-38, 42-45, 541-81). On May 9, 2006, the ALJ issued his decision finding Butler not disabled as of the date she was last insured (June 30, 2002). (Tr. 520-27). The ALJ found that Butler had not engaged in substantial gainful activity since the alleged onset of disability. (Tr. 525). At step two, the ALJ found that Butler had COPD and asthma, both of which are severe impairments. *Id*. At step three, the ALJ found that Butler did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20

C.F.R. Part 404, Subpart P, Appendix 1, specifically Listing 3.00 (20 C.F.R. 404.1520(d), 404.1525 and 404.1526). *Id*. At step four, the ALJ concluded that Butler had the residual functional capacity ("RFC") to perform "light work restricted to an air-conditioned environment with no exposure to deleterious environmental conditions such as chemicals, dust, and other contaminants, and no overhead work or climbing stairs." (Tr. 525-26). The ALJ further stated that Butler "could walk one to two blocks before needing to sit, sit in an upright position for 60 minutes at a time and six hours per workday, and stand for an hour at a time." (Tr. 526). The ALJ further found Butler could perform her past relevant work as a cashier and pawn shop clerk, and that based on Butler's RFC, Byron Pettingill, a vocational expert, stated that Butler could also perform "85% of the unskilled light jobs recognized by the Commissioner." (Tr. 527). The ALJ, using the Medical-Vocational Guidelines as a framework, *see* Appendix 2, Subpart P, Social Security Regulations No. 4, concluded Butler was not disabled because she could still perform her past relevant work as a cashier and pawn shop clerk as it was actually performed. *Id*.

Butler sought review of the ALJ's adverse decision with the Appeals Council. The Appeals Council will grant a request to review an ALJ's decision if any of the following circumstances are present: (1) it appears that the ALJ abused his discretion; (2) the ALJ made an error of law in reaching his conclusion; (3) substantial evidence does not support the ALJ's actions, findings or conclusions; or (4) a broad policy issue may affect the public interest. 20 C.F.R. ß 404.970; 20 C.F.R. ß 416.1470. After considering Butler's contentions in light of the applicable regulations and evidence, the Appeals Council concluded that there was a basis upon which to grant Butler's request for review. The Appeals Council therefore granted Butler's request and remanded the case to the ALJ for further review. (Tr. 17, 530-31, 534-36). The order

of the Appeals Council required the ALJ to: 1) "obtain evidence from a medical expert (respiratory specialist, if available, or internist) to determine if the claimant meets or equals a listing and, if not, clarify the nature and severity of the claimant's impairments" during the relevant period, 2) "give further consideration to the claimant's maximum [RFC] during the entire period at issue and provide rationale with specific references to evidence of record in support of assessed limitations," and, if appropriate, "request the treating source to provide additional evidence and/or further clarification of the opinions and medical source statement about what the claimant could still do despite the impairments through June 30, 2002," and 3) "obtain evidence from a vocational expert to clarify the effect of the assessed limitations, if any, on the claimant's occupational base." (Tr. 535-36).

The ALJ held a second hearing on February 12, 2007. (Tr. 582-622). On February 23, 2007, the ALJ issued his decision and again found that Butler was not disabled as of June 30, 2002. At step one, the ALJ found that Butler did not engage in substantial gainful activity during the relevant coverage period. (Tr. 19). At step two, the ALJ found that Butler's COPD, hypertension, and asthma were severe impairments. *Id*. At step three, the ALJ found that, through the date last insured, Butler's impairments failed to meet or equal a listed impairment for presumptive disability under the regulations. (Tr. 20). The ALJ found that Butler had the RFC to perform light work activity in a clean environment free from fumes, odors, dusts, gases, and poor ventilation, with no overhead work, and avoidance of climbing and heights. *Id*. The ALJ found at step four that Butler was capable of performing her past relevant work as a cashier and a pawnshop clerk. (Tr. 23). The ALJ therefore held that Butler was not under disability, as defined by the Social Security Act, from April 15, 1998 to June 30, 2002. *Id*.

The Appeals Council denied Butler's subsequent request for review on September 7, 2007, and the ALJ's decision became the Commissioner's final administrative decision. (Tr. 5-9). Butler filed a timely appeal of the ALJ's decision. 42 U.S.C. ß 405(g). The parties have filed cross motions for summary judgment (Document Nos. 11 & 13). The appeal is now ripe for ruling.

The evidence is set forth in the record, pages 1 through 622. There is no dispute as to the facts contained therein.

## III. Standard for Review of Agency Decision

The court's review of a denial of disability benefits is limited "to determining (1) whether substantial evidence supports the Commissioner's decision, and (2) whether the Commissioner's decision comports with relevant legal standards." *Jones v. Apfel*, 174 F.3d 692, 693 (5th Cir. 1999). Indeed, Title 42, Section 405(g) limits judicial review of the Commissioner's decision: "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." The Act specifically grants the district court the power to enter judgment, upon the pleadings and transcript, "affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing" when not supported by substantial evidence. 42 U.S.C.ß 405(g). While it is incumbent upon the court to examine the record in its entirety to decide whether the decision is supportable, *Simmons v. Harris*, 602 F.2d 1233, 1236 (5th Cir. 1979), the court may not "reweigh the evidence in the record nor try the issues de novo, nor substitute [its] judgment for that of the [Commissioner] even if the evidence preponderates against the [Commissioner's] decision." *Johnson v. Bowen*, 864 F.2d 340, 343 (5th Cir. 1988); *Jones v. Apfel*, 174 F.3d 692, 693 (5th Cir. 1999); *Cook v. Heckler*, 750 F.2d 391 (5th Cir. 1985). Conflicts in the evidence are for the Commissioner to

resolve. *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992).

The United States Supreme Court has defined "substantial evidence," as used in the Act, to be "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. N.L.R.B.,* 305 U.S. 197, 229 (1938). Substantial evidence is "more than a scintilla and less than a preponderance." *Spellman v. Shalala,* 1 F.3d 357, 360 (5th Cir. 1993). The evidence must create more than "a suspicion of the existence of the fact to be established, but no 'substantial evidence' will be found only where there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'" *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983).

## IV. Burden of Proof

An individual claiming entitlement to disability insurance benefits under the Act has the burden of proving his disability. *Johnson v. Bowen*, 864 F.2d 340, 344 (5th Cir. 1988). The Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. ß 423(d)(1)(A). The impairment must be proven through medically accepted clinical and laboratory diagnostic techniques. 42 U.S.C. ß 423(d)(3). The impairment must be so severe as to limit the claimant in the following manner:

> He is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied to work.

42 U.S.C. ß 423(d)(2)(A). The mere presence of an impairment is not enough to establish that

one is suffering from a disability. Rather, a claimant is disabled only if he is "incapable of engaging in any substantial gainful activity." *Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992) (quoting *Milam v. Bowen,* 782 F.2d 1284, 1286 (5th Cir. 1986)).

      The Commissioner applies a five-step sequential process to decide disability status:

      1. If the claimant is presently working, a finding of "not disabled" must be made;

      2. If the claimant does not have a "severe impairment" or combination of impairments, he will not be found disabled;

      3. If the claimant has an impairment that meets or equals an impairment listed in Appendix 1 of the Regulations, disability is presumed and benefits are awarded;

      4. If the claimant is capable of performing past relevant work, a finding of "not disabled" must be made; and

      5. If the claimant's impairment prevents him from doing any other substantial gainful activity, taking into consideration his age, education, past work experience and residual functional capacity, he will be found disabled.

*Anthony,* 954 F.2d at 293; *see also Leggett v. Chater,* 67 F.3d 558, 563 (5th Cir. 1995); *Wren v. Sullivan,* 925 F.2d 123, 125 (5th Cir. 1991). Under this framework, the claimant bears the burden of proof on the first four steps of the analysis to establish that a disability exists. If successful, the burden shifts to the Commissioner, at step five, to show that the claimant can perform other work. *McQueen v. Apfel,* 168 F.3d 152, 154 (5th Cir. 1999). Once the Commissioner shows that other jobs are available, the burden shifts, again, to the claimant to rebut this finding. *Selders v. Sullivan,* 914 F.2d 614, 618 (5th Cir. 1990). If, at any step in the process, the Commissioner determines that the claimant is or is not disabled, the evaluation ends. *Leggett,* 67 F.3d at 563.

      Here, the ALJ found at step four that Butler, despite her impairments and limitations, "had the residual functional capacity to perform light work as identified by the Commissioner at 20

CFR 404.1567(b), in a clean environment free from fumes, odors, dusts, gases, and poor ventilation, no overhead work, and avoidance of climbing and heights." (Tr. 20) Furthermore, the ALJ found that Butler "could return to her past relevant work as a cashier and pawn shop clerk, as actually and generally performed in the national economy," and that she could also "perform jobs as a sales clerk." (Tr. 23). The ALJ therefore found that Butler was not disabled. In this appeal, the Court must determine whether substantial evidence supports that step four finding, whether the ALJ used the correct legal standards in arriving at that conclusion, whether the ALJ complied with the order of the Appeals Council, whether the ALJ's step three finding that Butler's impairments did not meet the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 was correct, and whether the ALJ properly considered the opinions of Butler's treating physicians.

In determining whether substantial evidence supports the ALJ's decision, the court weighs four factors: (1) the objective medical facts; (2) the diagnosis and expert opinions of treating physicians on subsidiary questions of fact; (3) subjective evidence of pain and disability as testified to by the plaintiff and corroborated by family and neighbors; and (4) the plaintiff's educational background, work history and present age. *Wren,* 925 F.2d at 126.

## V. Discussion

### A. Objective Medical Evidence

The objective medical evidence shows that Butler suffers from COPD, hypertension, asthma, sinusitis, and yearly instances of bronchitis. The medical records show that on February 1, 1996, Butler was seen by Dr. David Stein at the Southmore Medical Center where she

complained of difficulty breathing, and was coughing and wheezing. (Tr. 111). Dr. Stein

diagnosed her with bronchitis and noted that Butler had "smoked a pack per day for 31 years." *Id*.

Dr. Stein also noted that Butler had "severe dyspnea on exertion, even walking around her

house." (Tr. 111). After receiving Biaxin, Albuterol, and Azmacort, Butler continued to be short

of breath. *Id*. Finally, Dr. Stein noted that Butler suffers from yearly episodes of bronchitis, had

bilateral wheezes in her lungs, and assessed her to have acute exacerbation of COPD. (Tr. 113,

426-27). On February 2, 1996, a pulmonary function test showed that Butler's FEV1 level was at

.94 before any drugs were administered. (Tr. 424). However, no post-drug testing was done to

determine how the drug might affect her FEV1 level. *Id*. Dr. Stein handwrote "severe obstructive

pulmonary disease" on that same results page. *Id*.

On December 15, 1997, Butler was examined by her primary care physician, Dr. Glenda

Goodine, at the Bayshore Medical Center. Dr. Goodine's assessment indicated that Butler had

asthma and showed signs of rhonchi, wheezing, and rales. (Tr. 391). A two-view chest radiology

report done that same day states that Butler's lungs appeared clear of acute disease, but that the

lungs also appeared mildly hyperextended and hyperlucent, and those symptoms could suggest

early emphysema. (Tr. 165). No radiographic evidence of acute pulmonary disease was found. *Id*.

On December 16, 1997, Dr. Goodine noted that Butler was feeling a little better, that she no

longer had rhonchi, wheezing, or rales, and that her asthma had improved. (Tr. 389). On

December 22, 1997, Dr. Goodine noted that Butler was again feeling a little better, but that she

still had a productive cough and some wheezing with distant breath sounds. (Tr. 387). Dr.

Goodine also assessed Butler to have COPD on that same day. *Id*. On December 23, 1997, Dr.

Stein examined Butler and diagnosed her with severe COPD and bronchitis. (Tr. 423). On

December 29, 1997, Dr. Goodine noted that Butler was not feeling good and had been suffering from a cough for three days. (Tr. 385). Dr. Goodine found that Butler had a cough, a few wheezes and rales, and distant breath sounds. *Id*. Dr. Goodine's assessment was that Butler had bronchitis and COPD. *Id*. On December 31, 1997, Dr. Goodine noted that Butler was feeling better, but still assessed her to have bronchitis and COPD. (Tr. 383).

On January 5, 1998, Butler returned to see Dr. Goodine at the Bayshore Family Practice Center. (Tr. 381). Dr. Goodine found that Butler was feeling better and had no rhonchi, wheezing, or rales. However, Dr. Goodine still assessed Butler to have asthma, bronchitis, and COPD. *Id*. On February 23, 1998, Butler was treated for an upper respiratory infection as well as COPD. (Tr. 379). On March 24, 1998, Butler returned to Dr. Goodine complaining of upper abdominal pain. (Tr. 375). On March 26, 1998, Dr. Ming Kuan Jeang examined Butler at the Bayshore Medical Center. (Tr. 142). Dr. Jeang took two chest x-rays, which were compared to previous x-rays, and showed no change since December 15, 1997. *Id*. On that same day, Butler underwent a cardiac stress test. (Tr. 143). Butler "exercised for 7 minutes and 31 seconds to the third stage of Bruce protocol and stopped because of shortness of breath and fatigue. There were no complaints of chest pains." *Id*.

On August 20, 1998, Dr. Goodine again examined Butler. Butler had no rhonchi, wheezing, or rales, but had hypertension. (Tr. 367). On September 15, 1998, Dr. Goodine performed a CT scan of Butler's sinuses. (Tr. 129). The CT scan showed that Butler had severe nasal deviation as well as mild chronic sinusitis involving the sphenoid sinus and right maxillary sinus. *Id*.

On January 4, 1999, Butler again saw Dr. Goodine because she came down with a sudden

cough, fever, had aches in her body, and felt as if her ears were closed. (Tr. 363). Dr. Goodine

noted that Butler had a cough but had no rhonchi, wheezing, or rales. Dr. Goodine diagnosed

Butler with an acute respiratory infection. *Id*. On January 13, 1999, Dr. Goodine noted that

Butler's flu, upper respiratory infection, and ear infection were better but had not completely

healed. (Tr. 356). On January 27, 1999, Butler again saw Dr. Goodine and complained of fever,

head congestion, and a cough that had persisted for the last three days. (Tr. 352). Dr. Goodine

found that Butler was wheezing and had rales. Dr. Goodine diagnosed Butler with asthma,

COPD, and an acute respiratory infection. *Id*. On May 15, 1999, Dr. Goodine found Butler to

have a cough and congestion and again diagnosed her with an upper respiratory infection. (Tr.

350). On May 18, 1999, Butler still complained of a cough and congestion that had lasted for five

days. (Tr. 348). On July 12, 1999, Butler complained to Dr. Goodine of nasal and chest

congestion, wheezing, nausea, and diarrhea. (Tr. 346). Dr. Goodine's assessment stated that

Butler had an acute respiratory infection and asthma. (Tr. 346). A physical examination document

dated October 7, 1999, states that Butler had increased wheezing and an acute exacerbation of

asthma. (Tr. 128).

On October 27, 1999, Dr. Bradley, of the Bayshore Medical Center, performed an

examination of Butler's chest. (Tr. 127). Dr. Bradley noticed that there was hyperaeration of both

lungs, minimal pulmonary infiltrates in the left lung base, and prominent markings on both lung

bases. *Id*. On November 2, 1999, Dr. Goodine remarked that Butler was feeling a little better. (Tr.

341). Even though Butler had not smoked in seven weeks, she still had a productive cough. *Id*.

Dr. Goodine noted that Butler's asthma was much better. *Id*. On November 11, 1999, Dr.

Goodine saw Butler and noted that Butler was smoking again. (Tr. 339). Dr. Goodine's

assessment stated that Butler had COPD and resolved bronchitis. *Id*. On November 20, 1999, Dr.

Jeang performed a stress thallium study on Butler. The results of the test stated that immediately

after exercise, perfusion images showed no significant defects, and at the time of redistribution,

there were also no significant defects. (Tr. 114). Based on the test results, Dr. Jeang concluded

that there were no significant chest pains with exercise. *Id*. On December 17, 1999, Butler

complained of a cough and congestion that had lasted for two days. (Tr. 337). Dr. Goodine's

assessment was that Butler was suffering from an upper respiratory infection. *Id*.

On July 24, 2000, Butler again saw Dr. Goodine with complaints of a stuffy nose,

nonproductive cough, and congestion that had lasted for a week. (Tr. 327). Dr. Goodine noted

that Butler had a few scattered wheezes as well as an upper respiratory infection. *Id*. Dr. Goodine

made a note that Butler was still smoking. *Id*. On August 1, 2000, Dr. Goodine treated Butler for

hypertension. (Tr. 327). . On August 4, 2000, Dr. Goodine noted that Butler's hypertension was

under control. (Tr. 323). On August 29, 2000, Dr. Goodine found that Butler's hypertension was

controlled. (Tr. 321). On August 31, 2000, Butler saw Dr. Bacon at River Oaks Imaging and

Diagnostic to have two views of her chest taken. (Tr. 199). The x-rays showed that Butler's lungs

were normally expanded, no air trapping was suggested, and that there was mild parenchymal

scarring that was secondary to an earlier inflammatory disease, pneumonia, or atelectasis. *Id*. Dr.

Bacon's final conclusion was that there was a slight irregularity of the right and left heart margin

that suggested mild right middle lobe and lingular scarring. *Id*. On October 10, 2000, Butler

complained of ear pain and congestion of the head and chest. (Tr. 315). Dr. Goodine assessed

Butler to have otitis media, otitis eternal, and an upper respiratory infection. *Id*. On November 30,

2000, Dr. Goodine diagnosed Butler with COPD, asthma, and resolving bronchitis. (Tr. 313).

Butler next saw Dr. Goodine on January 15, 2001. (Tr. 311). Butler complained of a cough with a green/yellow production, congestion, and a fever. *Id*. Dr. Goodine noted that Butler had sinusitis and bronchitis. *Id*. On April 18, 2001, Butler again complained of having a cough and congestion that had lasted for five days. (Tr. 309). Dr. Goodine found that Butler had rales and a cough and assessed Butler to have bronchitis and asthma. *Id*. On June 28, 2001, Dr. Goodine noted that Butler was complaining of a cough, congestion, and a sore throat that had lasted for four days. (Tr. 307). Dr. Goodine assessed Butler to be suffering from an acute respiratory infection. *Id*.

On February 25, 2002, Butler again went to Dr. Goodine complaining of a cough, congestion, and a fever that had lasted for five days. (Tr. 293). Dr. Goodine noted that Butler had a few wheezes, that she had good air entry, and that she did not have rales. *Id*. Dr. Goodine assessed Butler to have an acute respiratory infection and asthma, and again recommended that she stop smoking. *Id*. On April 12, 2002, Butler complained of a productive cough and congestion that had lasted for four days. (Tr. 291). Dr. Goodine noted that Butler had a cough and was wheezing, and diagnosed her with bronchitis and asthma exacerbation. *Id*. On May 20, 2002, Butler complained of sinus pressure, a stuffy nose, slight drainage, and a cough that had lasted for a week. (Tr. 289). Dr. Goodine assessed Butler to have an upper respiratory infection. *Id*. On November 21, 2002, Butler visited Dr. Goodine and complained of chest congestion, a productive cough, some sneezing, head congestion, and aches. (Tr. 276). Dr. Goodine assessed Butler to have asthma and bronchitis. *Id*. Dr. Goodine again suggested that Butler cease smoking. *Id*. On December 19, 2002, Butler had chest x-rays which were compared to the previous study of October 27th, 1999. (Tr. 127, 274, 438). Dr. Goodine found that Butler had pulmonary

hyperinflation and interstitial fibrosis. (Tr. 120). Dr. Goodine further noted that no definite active pulmonary infiltrates were identified. *Id*. On December 23, 2002, Butler complained of the flu and went to see Dr. Goodine. (Tr. 272). Dr. Goodine noted that Butler had a cough and that her chest pain had resolved. *Id*.

On April 14, 2003, Butler complained of a stuffy nose and head, a cough, and chest congestion. (Tr. 270). Dr. Goodine noted that Butler was well until "4/10/03." *Id*. Dr. Goodine also noted that Butler had distant breath sounds and a few scattered wheezes. *Id*. Dr. Goodine assessed Butler to have asthma exacerbation, COPD, and bronchitis. *Id*. Butler followed up with Dr. Goodine on April 17, 2003. (Tr. 268). Dr. Goodine noted that Butler was feeling better but that she still had a lot of mucus. *Id*. Dr. Goodine also noted that Butler had diminished breath sounds and was still wheezing. *Id*. Dr. Goodine assessed Butler to have COPD exacerbation. *Id*. Dr. Goodine also scheduled Butler for an appointment with Dr. Bradley for October 18, 2003. *Id*.

On April 18, 2003, Butler underwent a test that showed her pre-bronchodilator FEV1 level to be at .81. (Tr. 119, 518). Dr. Stein, the attending physician, commented that the results were indicative of "severe COPD" and further noted that Butler was still smoking. (Tr. 119, 216). On April 28, 2003, Dr. Stein performed chest and sinus x-rays on Butler. (Tr. 116). Dr. Stein found that Butler had no active pulmonary disease, but that she did have mild COPD. *Id*. Dr. Stein also found that Butler had mild sinusitis involving the ethmoid sinus and sphenoid sinus, and "maxillary antrum bilaterally without air fluid levels." *Id*. On May 2, 2003, Dr. Stein noted that Butler was "better!" (Tr. 215, 513). Dr. Stein performed a pulmonary consultation with Butler on October 31, 2003. (Tr. 510). Dr. Stein noted that Butler had quit smoking three days prior to the consultation. *Id*. Dr. Stein stated that Butler's medications included Theo-Dur, Singulair, Diovan,

Calan, Lipitor, and Evista. *Id*. He also noted that she appeared to be a frail white female and that

there were diminished breath sounds in her lungs. *Id*. Dr. Stein's impression was that Butler was

suffering from an acute exacerbation of COPD. *Id*. Dr. Stein's plan for Butler was to start her on

"antibiotic therapy to include atypical cover, bronchodilators." *Id*. Dr. Stein also advised that

Butler discontinue her smoking habit. *Id*. Dr. Goodine also examined Butler on October 31, 2003.

(Tr. 264). Dr. Goodine noted that Butler had a cough, fever, and a few rales. *Id*. Dr. Goodine

suspected that Butler was suffering from pneumonia. *Id*.

On October 31, 2003, Butler was admitted to Bayshore Medical Center under the care of

Dr. Harold Walton. Butler's discharge diagnosis on November 8, 2003, stated that she suffered

from an exacerbation of COPD and hypertension. (Tr. 167). More specifically, the discharge

summary stated that

> [t]he patient is a 53-year-old white lady with a  past medical history of asthma,
> hypertension, hiatal hernia, heavy smoker, and also history of osteoporosis. The patient
> presented to the emergency room with a 48-hour history of increased dyspnea, fever,
> cough which was not responding to oral antibiotics. She was found to have O2 stats of
> about 86% on room air. She was admitted to the medical floor. She was started on IV
> antibiotics. She received Ceftriaxone and Zithromax as well as IV Solu-Medrol 60 mg
> every eight hours. She was started on nebulized Xopenex and Atrovent, potassium
> supplementation, and her home medications were continued. A pulmonary consult with
> Dr. Stein was requested. With the above mentioned interventions, the patient slowly
> improved, but she persistently had significant resting dyspnea when off the oxygen. She
> was easily getting dyspneic with minimal exertion. The patient's theophylline dose was
> readjusted according to levels. A 2-D echocardiogram was requested. This was showing
> good LV function and possible mild to moderate pulmonary hypertension. Chest x-rays in
> follow up did not show any infiltrate. The patient was discharged home on 11/08/03 in
> stable condition. She was given prescriptions for oral antibiotics as well as for xanax.

(Tr. 167, 171, 173).

On November 13, 2003, Dr. Goodine examined Butler and noticed that she had distant

breath sounds. (Tr. 262). Dr. Goodine assessed Butler to have bronchitis and COPD. *Id*. On

November 17, 2003, Dr. Stein examined Butler and noted that she quit smoking. (Tr. 214). On November 24, 2003, Butler visited Dr. Goodine complaining of a stuffy head, cold, and sinus drainage. (Tr. 260). Dr. Goodine noted that Butler had decreased breath sounds, an upper respiratory infection, and COPD. *Id.* On December 4, 2003, Dr. Goodine noted that Butler had distant breath sounds and assessed her with COPD and resolved bronchitis. (Tr. 258).

On February 4, 2004, Butler visited Dr. Goodine and complained of sinus and chest congestion and a cough that had lasted for one and a half weeks. (Tr. 256). Dr. Goodine noted that Butler was wheezing and had rales. *Id.* Dr. Goodine assessed Butler to have COPD, acute bronchitis, and asthma. *Id.* Also, on February 4, 2004, a chest exam was performed on Butler at River Oaks Imaging and Diagnostic at the request of Dr. Goodine. (Tr. 191). The findings stated that "there are hypolucent areas in the lung fields" consistent with emphysema. *Id.* No evidence of consolidation, infiltrate, or effusion was found, and the overall impression was that Butler was suffering from mild COPD. *Id.* On February 5, 2004, Butler visited both Dr. Goodine and Dr. Stein and complained of a cold, sore throat, and sinusitis. (Tr. 213, 254). Dr. Goodine noted that Butler's wheezing had decreased but that she had diminished air entry, and Dr. Goodine assessed her to have COPD exacerbation. (Tr. 254). Dr. Stein noted that Butler was suffering from COPD. (Tr. 213). Butler again visited Dr. Stein on February 13, 2004, after complaining of a productive cough. (Tr. 212). On June 7, 2004, Butler visited with Dr. Goodine. (Tr. 250). Dr. Goodine wrote in her notes that Butler "sees pulmonologist repeatedly." *Id.* Dr. Goodine also noted that Butler had distant breath sounds and assessed her to have hypertension and COPD. *Id.* On August 13, 2004, Dr. Goodine noted that Butler had no rhonchi, wheezing, or rales and that her status was "better." (Tr. 244). However, Dr. Goodine still found that Butler had distant breath sounds

and assessed her to have COPD. *Id*. On August 27, 2004, Dr. Goodine noted that Butler had

hypertension. (Tr. 241). On August 31, 2004, Dr. Goodine noted that Butler's hypertension had

improved. (Tr. 237). On September 9, 2004, Dr. Goodine noted that Butler had distant breath

sounds and diagnosed her with hypertension, bronchitis, and COPD. (Tr. 234). On November 5,

2004, Butler went in for a follow up with Dr. Goodine. (Tr. 232). Dr. Goodine noted that Butler

still had distant breath sounds, but that her blood pressure was much improved. *Id*. Dr. Goodine

still assessed Butler with COPD. *Id*. On December 10, 2004, Dr. Knudson, in a radiology report

from East Side Imaging, stated that Butler's lungs were hyperexpanded with flattened diaphragms

and with interstitial lung markings noted. (Tr. 204).  Dr. Knudson also noted that Butler was

wearing oxygen and that there was no definite acute infiltrate. *Id*. Dr. Knudson's overall

impression was that Butler suffered from apparent severe COPD. *Id*. Also on December 10, 2004,

tests by Dr. Stein showed Butler's pre-bronchodilator FEV1 level to be at .67, and Dr. Stein

noted that this was indicative of "very severe COPD." (Tr. 205). On December 28, 2004, Butler

saw Dr. Goodine and complained of chest congestion. (Tr. 230). Dr. Goodine found that Butler

was wheezing and had distant breath sounds. *Id*. Dr. Goodine assessed Butler to have bronchitis

and advanced COPD. *Id*.

On January 21, 2005, Dr. Stein examined Butler and noted that she was "better!" (Tr.

498). On February 2, 2005, Butler complained to Dr. Goodine of a cough, congestion, and sore

throat that had lasted for the last two days. (Tr. 228). Dr. Goodine assessed Butler to have an

acute upper respiratory infection and an exacerbation of COPD. *Id*. On April 8, 2005, Dr.

Goodine noted that Butler had a few wheezes. (Tr. 225). On May 10, 2005, Dr. Goodine

examined Butler and noted that she had increased dyspnea and an increased cough with

productive yellow sputum. (Tr. 218). Dr. Goodine's assessment stated that Butler's COPD was

exacerbated. *Id*. On August 9, 2005, Dr. Stein noted that Butler had green sputum, sinusitis, and

severe COPD. (Tr. 433, 493). Dr. Stein also determined that Butler's FEV1 level on that day was

.76. (Tr. 422). Also on August 9, 2005, Dr. Stein filled out a pulmonary residual functional

capacity questionnaire regarding Butler. (Tr. 417). Dr. Stein stated in the questionnaire that he

has been treating Butler since 1996 and that he has diagnosed her with COPD and hypertension.

*Id*. Dr. Stein stated that Butler's symptoms were shortness of breath, orthopnea, chest tightness,

wheezing, rhonchi, edema, epidosic acute bronchitis, episodic pneumonia, fatigue, and coughing.

*Id*. Dr. Stein described Butler's prognosis as "poor." (Tr. 418). Dr. Stein also noted that Butler

could only walk for less than a city block before needing to rest or experiencing severe pain. *Id*.

Furthermore, Dr. Stein stated that Butler could sit for only five minutes at a time, could only

stand for five minutes at a time, and could never lift between one and ten pounds in a competitive

work situation. *Id*. Dr. Stein also noted that Butler could never twist, stoop (bend), crouch/squat,

climb ladders, or climb stairs. (Tr. 419). On November 8, 2005, Dr. Stein again assessed Butler to

have severe COPD. (Tr. 432).

On February 17, 2006, a report from the Cardiovascular Center stated that Butler suffered

from COPD. (Tr. 488). On February 20, 2006, Dr. Stein requested that River Oaks Imaging and

Diagnostic perform a two-view chest x-ray on Butler. (Tr. 399). This report was to be compared

to the x-ray report of 2/4/2004. *Id*. The x-rays found there were mild COPD changes. *Id*. More

specifically, the radiologist wrote:

> Two views of the chest demonstrate normal cardiomediastinal silhoutte. Pulmonary
> vasculature is unremarkable. No consolidation of pleural effusion is seen. Hyperinflation of
> the lungs with flattening of the hemidiaphragms is seen. There are generalized increase in
> interstitial markings bilaterally, likely representing chronic pulmonary scarring. There is an

> ill-defined 6 mm nodular opacity seen projecting between the right 9th and 10th ribs,
> suggesting a small right lower lobe pulmonary nodule versus artifacts from summation of
> shadow.

*Id*. On May 10, 2006, Dr. Stein examined Butler and found no change in her severe COPD. (Tr.

490). On June 28, 2006, Butler visited Dr. Goodine complaining of nausea and dizziness that

lasted for two days. (Tr. 468). Dr. Goodine noted that Butler had distant breath sounds and

assessed her to have vertigo and hypertension. *Id*. On August 31, 2006, Dr. Goodine found Butler

to have distant breath sounds and assessed her with COPD. (Tr. 464). On December 1, 2006, Dr.

Goodine referred Butler to Dr. Stein at the Bayshore Medical Center because Butler was suffering

from shortness of breath and had been ill for five days prior to admission with a productive cough,

fever, chills, and elevated blood pressure. (Tr. 474). Dr. Stein described Butler as a well-

developed white female who was anxious and who also had wheezing in all lung fields. *Id*. Dr.

Stein's impression was that Butler was suffering from acute exacerbation of COPD. *Id*. Further,

Dr. Stein noted that Butler was taking corticosteroids, Protonix, broad-spectrum antibiotic cover,

Calan, Cozaar, Os-Cal, Wellbutrin, hydrochlorothiazide, and Lipitor. *Id*. Dr. Stein stated in the

discharge summary that Butler was on oxygen for many years and quit smoking too. (Tr. 476).

Dr. Stein also noted that Butler was treated with Biaxin and cefepime when she was admitted and

she improved rapidly. *Id*. Dr. Stein explained that Butler was discharged on "advair 250 mcg,

nebulized albuterol, Biaxin, Wellbutrin 150 mg, Evista 60 mg, guaifenesin p.r.n., Atrovent

nebulizer treatment, Microzide 12.5 mg, Nasonex, Os-Cal +D, Protonix, Singulair, Calan 180 mg,

and Zocor 20 mg." *Id*. On December 4, 2006, Dr. Stein took an x-ray of Butler's chest. (Tr. 477).

Dr. Stein found that Butler's lungs were clear without discrete lung mass or nodule, there was no

effusion or congestion, there was generative lung scarring and pleural thickening, and there was

no pathologic adenopathy. *Id*.

On February 27, 2007, Dr. Stein completed a second pulmonary impairment questionnaire for Butler. (Tr. 537). Dr. Stein stated that he had been treating Butler for eleven years, that he had diagnosed her with COPD and hypertension, and that her prognosis was poor. *Id.* Dr. Stein also stated that Butler requires continuous supplemental oxygen and that she is prone to dyspnea with minimal exertion. *Id.* Dr. Stein also stated that Butler is incapable of tolerating even "low stress" jobs. *Id.* Dr. Stein further noted that Butler's dyspnea and other symptoms would constantly be severe enough to limit her performance of even simple work tasks. *Id.* Dr. Stein also indicated that Butler would only be able to stand and walk for less than two hours of an eight hour work day, and that Butler would only be able to sit for less than two hours during an eight hour day. *Id.* When asked which postural activities Dr. Stein would recommend that Butler avoid, he put a check mark next to stoop, crouch, climb stairs, and climb ladders. (Tr. 538). Dr. Stein recommended that Butler avoid all exposure to extreme cold, extreme heat, wetness, humidity, fumes, odors, dusts, gases, poor ventilation, and various hazards such as machinery and heights. *Id.* Finally, Dr. Stein stated that, based on his education and medical training, Butler's physical limitations reflect her functional ability since January 2002. *Id.*

On March 18, 2007, Dr. Goodine completed a similar pulmonary impairment questionnaire. (Tr. 539). Dr. Goodine stated that she had been treating Butler for approximately eleven years, that she had diagnosed her with COPD and hypertension, and that Butler's prognosis was poor. *Id.* Dr. Goodine also stated that Butler is incapable of tolerating even a "low stress" job, and that her dyspnea or other symptoms would constantly be severe enough to interfere with the attention and concentration needed to perform even simple work tasks. *Id.* Dr. Goodine noted that Butler's maximum ability to stand and walk during an eight hour work day

would be less than two hours, and that her maximum ability to sit during an eight hour work day would also be less than two hours. *Id*. Like Dr. Stein, Dr. Goodine also recommended that Butler avoid stooping, crouching, climbing stairs, and climbing ladders. *Id*. Dr. Goodine stated that Butler's impairment would frequently interfere with her ability to reach and push/pull on the job, but that her impairment would not impair her ability to finger (fine manipulation), feel, or handle (gross manipulation). (Tr. 540). Also like Dr. Stein, Dr. Goodine recommended that Butler avoid all exposure to extreme cold, extreme heat, wetness, humidity, fumes, odors, dusts, gases, poor ventilation, and hazards such as machinery and heights. *Id*. Finally, Dr. Goodine also stated that, based on her education and medical training, Butler's physical limitations mentioned in the questionnaire reflect Butler's functional abilities since January, 2002. *Id*.

Having reviewed the objective medical evidence in the record, it is clear that Butler has many severe impairments and that prior to and after her date last insured she meets all the requirements of a presumptive disability listing of COPD in Listing 3.02(A). To be presumptively disabled under Listing 3.02(A), a claimant must have an FEV1 "equal to or less than the values specified in Table I corresponding to the person's height without shoes." Butler had her FEV1 tested four times. At Butler's first test on February 2, 1996, Dr. Stein wrote that Butler was sixty-two inches tall. (Tr. 424). At Butler's second test on April 18, 2003, Dr. Stein noted that she was sixty-three inches tall. (Tr. 421). At Butler's third test on December 10, 2004, Dr. Stein wrote that Butler was sixty-three inches tall. (Tr. 205). At Bulter's fourth test on August 9, 2005, Dr. Stein wrote that Butler was again sixty-three inches tall. (Tr. 422). Table I states that a person who is between sixty-one and sixty-three inches tall is presumptively disabled with COPD if their

FEV1 value is equal or less than 1.15. Butler's FEV1 values were .94 in 1996, .81 in 2003, .67 in 2004, and .76 in 2005.

However, when doing a pulmonary function test to determine one's FEV1 levels, the attending physician must do two tests: the first must be done without bronchodilators and the second must be done with bronchodilators. (Tr. 544). Here, the tests performed on Butler were all pre-bronchodilators. The ALJ stated that "the FEV1 has to be with dilation." *Id*. Accordingly, the ALJ concluded that Butler was not presumptively disabled under Listing 3.02(A). Butler challenges this finding on the ground that the regulations mentioned by the ALJ are silent about totally disregarding pre-bronchodilator results if post-bronchodilator results were not also done, which is what happened in Butler's case. There is no doubt that Butler's pre-bronchodilator FEV1 levels met the presumptive disability requirement and, with the exception of the .76 result in 2005, got progressively worse over time. Therefore, instead of disregarding these results, the ALJ should have sought additional information from Dr. Stein, Butler's pulmonologist, concerning the tests, namely the type given, why it was given, and any adjustments one would expect with a bronchodilator. Dr. Stein, who has been Butler's pulmonolgist for the last eleven years, has a unique insight into Butler's condition and would have been able to provide the ALJ with an expert opinion explaining how Butler's FEV1 levels may have been affected by the use of bronchodilators. After finding that all the pulmonary function tests were done pre-bronchodilator, the ALJ stated, "See, that's the trouble. So, it looks like we're going to have to base this on her residual functional capacity." (Tr. 548). Because the ALJ disregarded these vital pre-bronchodilator FEV1 results instead of recontacting Dr. Stein and asking him to explain them in

greater detail, substantial evidence does not support the ALJ's finding that Butler was not presumptively disabled.

Moreover, the tests are indicative of Butler's FEV1 levels at times before and after the relevant period of coverage. Because there was a lack of information regarding the severity of Butler's FEV1 levels during her coverage period, the ALJ should have contacted either Dr. Goodine or Dr. Stein concerning Butler's FEV1 levels to find out whether Butler suffered from COPD during the coverage period, and how severe Butler's COPD may have been. Even though Dr. Stein did not treat Butler during the relevant period, he could provide expert opinion and insight into the severity of Butler's COPD during that time based on the available medical records.

A final issue becomes apparent after reading the ALJ's decision. Namely, the ALJ stated that through the date last insured, Butler's severe impairments included COPD, hypertension, and asthma. (Tr. 19). Despite Butler's numerous diagnoses of hypertension and asthma during the relevant period from April 15, 1998 to June 30, 2002, there is little evidence within the ALJ's decision or in the transcript to suggest that the ALJ took Butler's hypertension or asthma into account when evaluating her condition. The ALJ did state in his decision that Dr. Goldstein, the medical expert, indicated that "in November 1999 it was noted that [Butler's] asthma and bronchitis was resolving and that there was no wheezing." (Tr. 22). However, noting one instance where Butler's asthma temporarily improved is not sufficient to dismiss her asthma as not disabling because there are other instances at later dates within the relevant period where Butler's asthma worsened. For example, on April 12, 2002, Dr. Goodine found Butler to be coughing and wheezing and diagnosed her with bronchitis and asthma exacerbation. (Tr. 291). 20 C.F.R. ß 404.1523 states that

> [i]n determining whether your physical or mental impairment or impairments are of a
> sufficient medical severity that such impairment or impairments could be the basis of
> eligibility under the law, we will consider the combined effect of all of your impairments
> without regard to whether any such impairment, if considered separately, would be of
> sufficient severity. If we do find a medically severe combination of impairments, the
> combined impact of the impairments will be considered throughout the disability
> determination process.

20 C.F.R. ß 404.1523. There is no evidence within the record that the ALJ examined the potential

combined effects of Butler's COPD, hypertension, and asthma as the Code of Federal Regulations

requires in 20 C.F.R. ß 404.1523.

In conclusion, there appears to be sufficient objective medical evidence within the record

to suggest that it was possible that Butler was presumptively disabled. Instead of disregarding the

results of the pulmonary function tests because Butler's post-bronchodilator FEV1 levels were

never taken, the ALJ should have recontacted Dr. Stein and requested his informed opinion about

what Butler's FEV1 levels would have been during the relevant period and how bronchodilators

were likely to affect Butler's FEV1 levels. Additionally, the objective medical evidence suggests

that the ALJ should have examined Butler's asthma and hypertension to determine if either was

severe enough to qualify Butler as presumptively disabled. Finally, the ALJ, pursuant to 20 C.F.R.

ß 404.1523, should have considered all of Butler's impairments collectively to determine if their

combined effect would have been of sufficient severity to qualify Butler as presumptively disabled.

Therefore, the objective medical evidence factor does not support the ALJ's decision because the

ALJ's examination of the objective medical evidence was incomplete and the ALJ should have

undertaken a more detailed inquiry.

**B. Diagnosis and Expert Opinions**

The second element considered is the diagnosis and expert opinions of treating and

examining physicians on subsidiary questions of fact. Unless good cause is shown to the contrary, "the opinion, diagnosis and medical evidence of the treating physician, especially when the consultation has been over a considerable length of time, should be accorded considerable weight." *Perez v. Schweiker,* 653 F.2d 997, 1001 (5th Cir. 1981); *see also Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000) ("The opinion of the treating physician who is familiar with the claimant's impairments, treatments and responses should be accorded great weight in determining disability."). In addition, a specialist's opinion is generally to be accorded more weight than a non-specialist's opinion. *Paul v. Shalala*, 29 F.3d 208, 211 (5th Cir. 1994); *Moore v. Sullivan*, 919 F.2d 901, 905 (5th Cir. 1990). For the ALJ to give deference to a medical opinion, however, the opinion must be more than conclusory and must be supported by clinical and laboratory findings. *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985); *Oldham v. Schweiker*, 660 F.2d 1078 (5th Cir. 1981). Further, regardless of the opinions and diagnoses and medical sources, "'the ALJ has sole responsibility for determining a claimant's disability status.'" *Martinez v. Chater*, 64 F.3d 172, 176 (5th Cir. 1995) (quoting *Moore v. Sullivan*, 919 F.2d 901, 905 (5th Cir. 1990)).

Furthermore, the ALJ has a duty "to develop the facts fully and fairly relating to an applicant's claim for disability benefits," and if "the ALJ does not satisfy his duty, his decision is not substantially justified." *Newton v. Apfel*, 209 F.3d 448, 457 (5th Cir. 2000) (quoting *Ripley v. Chater*, 67 F.3d 552, 557 (5th Cir. 1995)). Additionally, 20 C.F.R ß404.1512(e) explains the procedure that must be followed when evidence from a treating physician or other medical source is inadequate to determine whether or not a claimant is disabled. The rules state that

> [w]e will first recontact your treating physician or psychologist or other medical source to determine whether the additional information we need is readily available. We will seek additional evidence or clarification from your medical source when the report from your medical source contains a conflict or ambiguity that must be resolved, the report does not

contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques. We may do this by requesting copies of your medical source's records, a new report, or a more detailed report from your medical source, including your treating source, or by telephoning your medical source.

20 C.F.R. ß 404.1512(e)(1).

On August 9, 2005, Dr. Stein filled out a pulmonary residual functional capacity questionnaire regarding Butler. (Tr. 417). Dr. Stein stated in the questionnaire that he had been treating Butler since 1996 and that he diagnosed her with COPD and hypertension. *Id*. Dr. Stein stated that Butler's symptoms were shortness of breath, orthopnea, chest tightness, wheezing, rhonchi, edema, epidosic acute bronchitis, episodic pneumonia, fatigue, and coughing. *Id*. Dr. Stein described Butler's prognosis as "poor." (Tr. 418). Dr. Stein also noted that Butler could only walk for less than a city block before she would experience severe pain and need to rest. *Id*. Furthermore, Dr. Stein stated that Butler could sit for only five minutes at a time, could only stand for five minutes at a time, and could never lift between one and ten pounds in a competitive work situation. *Id*. Dr. Stein also noted that Butler could never twist, stoop (bend), crouch/squat, climb ladders, or climb stairs. (Tr. 419).

On February 27, 2007, Dr. Stein completed a second pulmonary impairment questionnaire for Butler. (Tr. 537). Dr. Stein stated that he had been treating Butler for eleven years, that he had diagnosed her with COPD and hypertension, and that her prognosis was poor. *Id*. Dr. Stein also stated that Butler requires continuous supplemental oxygen and that she is prone to dyspnea with minimal exertion. *Id*. Dr. Stein also stated that Butler is incapable of tolerating even "low stress" jobs. *Id*. Dr. Stein further noted that Butler's dyspnea and other symptoms would constantly be severe enough to limit her performance of even simple work tasks. *Id*. Dr. Stein also

indicated that Butler would only be able to stand and walk for less than two hours of an eight hour work day, and that Butler would only be able to sit for less than two hours during an eight hour day. *Id*. When asked which postural activities Dr. Stein would recommend that Butler avoid, he put a check mark next to stoop, crouch, climb stairs, and climb ladders. (Tr. 538). Dr. Stein recommended that Butler avoid all exposure to extreme cold, extreme heat, wetness, humidity, fumes, odors, dusts, gases, poor ventilation, and various hazards such as machinery and heights. *Id*. Finally, Dr. Stein stated that, based on his education and medical training, Butler's physical limitations reflect her functional ability since January 2002. *Id*.

On March 18, 2007, Dr. Goodine completed a similar pulmonary impairment questionnaire. (Tr. 539). Dr. Goodine stated that she had been treating Butler for approximately eleven years, that she had diagnosed her with COPD and hypertension, and that Butler's prognosis was poor. *Id*. Dr. Goodine also stated that Butler is incapable of tolerating even a "low stress" job, and that her dyspnea or other symptoms would constantly be severe enough to interfere with the attention and concentration needed to perform even simple work tasks. *Id*. Dr. Goodine noted that Butler's maximum ability to stand and walk during an eight hour work day would be less than two hours, and that her maximum ability to sit during an eight hour work day would also be less than two hours. *Id*. Like Dr. Stein, Dr. Goodine also recommended that Butler avoid stooping, crouching, climbing stairs, and climbing ladders. *Id*. Dr. Goodine stated that Butler's impairment would frequently interfere with her ability to reach and push/pull on the job, but that her impairment would not impair her ability to finger (fine manipulation), feel, or handle (gross manipulation). (Tr. 540). Also like Dr. Stein, Dr. Goodine recommended that Butler avoid all exposure to extreme cold, extreme heat, wetness, humidity, fumes, odors, dusts, gases, poor

ventilation, and hazards such as machinery and heights. *Id*. Finally, Dr. Goodine also stated that, based on her education and medical training, Butler's physical limitations mentioned in the questionnaire reflect Butler's functional abilities since January, 2002. *Id*.

A vocational expert (VE), Byron Pettingill, testified at the first Social Security Administration hearing. When asked whether he had enough information to give an expert opinion, Pettingill responded, "I think so, Your Honor." (Tr. 572). The ALJ's first hypothetical for Pettingill inquired as to whether or not there would be any available jobs for a hypothetical person with a residual functional capacity of light work in which that person cannot be exposed to deleterious environmental conditions, needs an air-conditioned environment with no excessive dust or other contaminants, no overhead work or stairs, walking limited to approximately one to two blocks at a time and then sitting for no more than sixty minutes at a time and standing for no more than one hour at a time. (Tr. 573-74). The VE answered that a significant number of all light, unskilled jobs would exist for that hypothetical person. (Tr. 575). However, the ALJ's third hypothetical assumed all the same limitations as the first, but added the caveat that the hypothetical person is required to use oxygen full time. *Id*. The VE answered that no jobs would be available for that hypothetical person. (Tr. 576).  At the second hearing, the VE stated that according to the residual limitations provided by Dr. Stein on August 9, 2005, Butler could not do any of her past relevant work or any other job, and she would be precluded from all competitive employment. (Tr. 417-27, 618-19).

Dr. Steven Goldstein, an internist and the medical expert (ME), testified at the second hearing before the ALJ. When asked whether Butler met the listing for COPD, the ME stated

Okay, well, I would say she don't [*sic*] meet the listing and in 1998 at least she was at a

> light level of activity. Later on you really can't tell because there's really no good physical examination between any exacerbation of her COPD when she was doing relatively well to know how, what her residual functional capacity would be. There's just no physical examination.

(Tr. 591). The ALJ then asked what Butler's residual functional capacity was at the time of the hearing and the ME responded by saying that "there's no physical examination in the record that would enable me to know that." *Id*. Additionally, when asked to interpret a residual functional capacity report from Dr. Stein in 2005, the ME stated that he "didn't have any, any medical records where [he] would be able to say yeah or nay that's correct or it's not correct." (Tr. 591-92). When asked why the ME could not use the medical reports from Dr. Goodine at the Bayshore Family Practice to interpret the residual functional capacity reports, the ME stated that the records were not helpful because there was "very little physical examination there." (Tr. 593). When asked what the estimation of Butler's current residual functional capacity with bronchodilators would be, the ME stated that he "couldn't say because [he did not] have enough medical information to say." (Tr. 602-03). The ME further stated that

> I would say based on the pulmonary function test she was able to achieve light level of activities and again with the physical examinations that were done by the family doctor that I could see in the 1999, 2000, 2001 period does not really allow me to, to say what, what she could do. I would assume she would gradually deteriorate as, as chronic obstructive lung disease does from a light level when she got to be at a sedentary level. I don't know if she's sedentary now or that she's light now or whether she would be less than sedentary. I can't tell from the medical records that I was furnished.

(Tr. 603). When the ALJ asked the ME what his degree of confidence was that Butler was at the light level, or at least above sedentary, as of 2002, the ME stated:

> Well, looking at the treating notes from the Bayshore Family Practice I would guess that she would be at a light level of activities, but there's just, I don't have a great level of confidence. I'm just looking at the types of complaints that she has and the examination of her lungs which is all that I have listed here.

(Tr. 603). While being examined by Butler's attorney, the ME stated:

> Certainly during the exacerbations in the hospital she wouldn't be at a light level but I really had nothing to hang my hat on in the, in the, what her baseline condition was what she would be, and I just said light because by default really I really don't know for certain and I did testify to that, that she could have had significant deterioration. I just didn't have the medical evidence to show that.

(Tr. 616).

The ALJ, in his written decision, found that Butler had numerous severe impairments, including COPD, hypertension, and asthma. (Tr. 19). The ALJ further found that none of Butler's impairments, either singly or in combination, met or equaled a listing. *Id.* Then, the ALJ determined that Butler had the "residual functional capacity to perform light work in a clean environment free from fumes, odors, dusts, gases, poor ventilation, no overhead work, and avoidance of climbing and heights." *Id.* The ALJ's determination is contrary to the expert medical and vocational opinions in the record.

First, the ALJ's decision misconstrues the testimony of Dr. Goldstein, the ME. Nowhere in the ALJ's decision is there any mention of the multiple times that Dr. Goldstein stated that his opinion about Butler's condition was essentially nothing more than a guess. Dr. Goldstein continuously stated that the medical records lacked sufficient information for him to make a proper determination of Butler's RFC. Additionally, Plaintiff argues that Dr. Goldstein was not an appropriate medical expert because the Order of Appeals Council required that, upon remand, the ALJ was to "[o]btain evidence from a medical expert (respiratory specialist, if available, or internist) to determine if the claimant meets or equals a listing." (Tr. 535). Dr. Goldstein was an internist and stated that he saw a few COPD patients, but that was not the primary area of his practice. (Tr. 605). Taking into consideration the lack of conclusive evidence regarding the

severity of Butler's COPD during the relevant period, the ALJ should have attempted to find a respiratory specialist who could have provided greater insight than Dr. Goldstein's admitted conjectures, such as "Dr. Stanton Fischer, a pulmonologist recognized by the Commissioner as a Medical Expert, [who] does reside in Houston and [who] does regularly provide expert testimony regarding Social Security Disability." (Document 12 page 10). Because the ALJ did not obtain an appropriate medical expert, he did not comply with his duty "to develop the facts fully and fairly relating to an applicant's claim for disability benefits," and "his decision is not substantially justified." *Newton*, 209 F.3d 448, 457 (5th Cir. 2000) (quoting *Ripley v. Chater*, 67 F.3d 552, 557 (5th Cir. 1995)).

Second, the ALJ's opinion neglected to mention an important finding of the VE, Byron Pettingill. Namely, the VE found that there would be no jobs available for a hypothetical person who is required to use oxygen full time. (Tr. 576). The VE stated that his experience "has been that an employer considers that an accommodation that they can't make." *Id*. Butler testified at her hearing that Dr. Stein, in 2003, advised her to use oxygen continuously because "the COPD had worsened." (Tr. 598-99). Therefore, even if it is true that Butler's vocational profile and residual functional capacity would allow her to return to her past relevant work as a cashier and pawn shop clerk, as actually and generally performed in the national economy, the ALJ did not seem to take into account the fact that no one would be willing to hire Butler because she continuously required supplemental oxygen. It is true that 20 C.F.R. ß 404.1566 states that "[w]e will determine that you are not disabled if your residual functional capacity and vocational abilities make it possible for you to do work which exists in the national economy, but you remain unemployed because of…(3) The hiring practices of employers." 20 C.F.R. ß 404.1566.

However, this provision is inapplicable here because of the VE's testimony that Butler's residual limitations, documented in Dr. Stein's 2005 Pulmonary Residual Functional Capacity Questionnaire, precluded her from performing any of her past relevant work or any other job, and also precluded from all competitive employment. (Tr. 417-27, 618-19).

Third, the ALJ erred by not giving enhanced weight to the residual functional capacity questionnaires completed by Dr. Stein and Dr. Goodine. 20 C.F.R. ß 404.1527(d)(1) states that "[g]enerally, we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you." Additionally, the law requires that the opinion of a specialist be given greater weight than a non-specialist. *Paul*, 29 F.3d at 211 (5th Cir. 1994); *Moore*, 919 F.2d at 905 (5th Cir. 1990). This implies that the ALJ should have given less deference to the opinion of Dr. Goldstein, a non-specialist who never examined Butler, and should have given more deference to the opinions of Dr. Goodine and Dr. Stein because they had each treated Butler over a period of eleven years. However, the ALJ stated that he rejected Dr. Stein's opinion because it was inconsistent with the objective medical evidence of record, and gave "controlling weight to the medical expert because his opinion is more consistent with the evidence of record during the relevant period under consideration." (Tr. 22). The ALJ also based this decision on the fact that Butler had not seen Dr. Stein on a regular basis. *Id*. As a result, the ALJ completely deferred to the opinion of Dr. Goldstein, the medical expert, and held that "[t]he opinion of the medical expert is credible and consistent with the objective medical evidence of record." *Id*. However, as previously stated, Dr. Goldstein admitted that he lacked sufficient information regarding Butler's medical history to provide an informed and conclusive opinion about her RFC. Therefore, the ALJ erred by adopting the inconclusive medical opinion of a non-

specialist who never personally examined Butler. The ALJ should have given more consideration to the opinions of Dr. Stein, a specialist who treated Butler periodically over an eleven-year period, and Dr. Goodine, Butler's primary care physician who treated her continuously during the relevant period.

Fourth, the ALJ erred by not recontacting Dr. Goodine or Dr. Stein pursuant to 20 C.F.R. ß 404.1512(e)(1). The ALJ expressed that the evidence from the treating physicians was inadequate to make a disability determination by stating that "[t]here's got to be another sheet where [Dr. Stein] dilated her, because I mean, if this guy was a pulmonary person, he knows that he has to have both the readings in order to be able to diagnose her," and "[s]o I would imagine there's got to be something someplace else." (Tr. 556). Because of the lack of information, the ALJ had a duty to "first recontact [the claimant's] treating physician…to determine whether the additional information [needed was] readily available." 20 C.F.R. ß 404.1512(e)(1). Additionally, *Newton* requires an ALJ expressing doubt in a treating physician's medical determination to "request additional information to eliminate those doubts before rejecting the opinion of the treating physician." *Newton*, 209 F.3d at 458. The ALJ erred because he dismissed the medical opinions of both Dr. Stein and Dr. Goodine before recontacting either of them to have them explain and supplement the missing information.

In conclusion, the ALJ erred by adopting the inconclusive testimony of a non-specialist medical expert, by not giving enhanced weight to the medical opinions of Dr. Stein and Dr. Goodine, both of whom had treated Butler over an eleven year period, and by not recontacting Dr. Stein or Dr. Goodine to have them supplement the missing or inconclusive medical records.

**C. Subjective Evidence of Pain and Disability**

The third element considered is the subjective evidence of pain and disability, including the claimant's testimony and corroboration by family and friends. Not all pain and subjective symptoms are disabling, and the fact that a claimant cannot work without some pain or discomfort will not render him disabled. *Cook,* 750 F.2d at 395. The proper standard for evaluating pain is codified in the Social Security Disability Benefits Reform Act of 1984, 42 U.S.C ß 423. The statute provides that allegations of pain do not constitute conclusive evidence of disability. There must be objective medical evidence showing the existence of a physical or mental impairment that could reasonably be expected to cause pain. Statements made by the individual or her physician as to the severity of the plaintiff's pain must be reasonably consistent with the objective medical evidence on the record. 42 U.S.C. ß 423. "Pain constitutes a disabling condition under the SSA only when it is 'constant, unremitting, and wholly unresponsive to therapeutic treatment.'" *Selders*, 914 F.2d at 618-19 (citing *Darrell v. Bowen*, 837 F.2d 471, 480 (5th Cir. 1994). In an appeal of a denial of benefits, the Act requires this Court's findings to be deferential. The evaluation of evidence concerning subjective symptoms is a task particularly within the province of the ALJ, who has the opportunity to observe the claimant. *Hames v. Heckler,* 707 F.2d 162, 166 (5th Cir. 1983).

Butler testified at the hearing before the ALJ that she first started seeing her doctor with breathing problems in the winter months of 1996 after she was "hospitalized in South Moore Hospital for hospital pneumonia." (Tr. 550-51). Butler testified that after her hospitalization the doctors began to treat her with albuterol nebulizers and inhalers. (Tr. 551). Butler also testified that between 1996 and 2002 she was prescribed Theophylline and Singulair to aid her pulmonary function. (Tr. 553). Butler stated that some of her antibiotics nauseated her, but not the

Theophylline. (Tr. 571). Butler testified that a nebulizer could take between fifteen and twenty minutes to complete, and that in 1996 she was taking them around the clock every four hours. (Tr. 551). Butler testified that she still takes nebulizers today. *Id.* Butler testified that she quit working with the Harris County Toll Road Authority in 1996 because she was exposed to exhaust fumes from automobiles. (Tr. 552). Butler testified that she worked as a toll collector for about a year and that she was eventually put into very high traffic areas where her problems worsened. (Tr. 558). Butler then testified that she began using oxygen in October after quitting her job, and that before quitting her job she only ever used oxygen during hospitalizations. (Tr. 552-53).

Regarding her activities, Butler stated that she had to have help when going outside, to the store, and when she cooked. (Tr. 559). Butler stated that she needed help lifting pots and straining food, and that she mainly just put the food together. *Id.* Butler testified that she did not do any cleaning and that her husband did it all. *Id.* Butler also testified that prior to 2002 she had trouble taking care of her personal needs like showering and grooming. (Tr. 559-60). Butler stated that she had to have a stool in the shower because she could not stand for long periods of time with a lot of movement, and that her showers could last for as long as two hours. (Tr. 71, 560). Butler testified that with a lot of movement, she could only stand for about three to five minutes at a time before she became very out of breath (Tr. 560-61). Butler testified that she would also lose her breath if she tried to reach above her head. (Tr. 561).

Butler further testified that she underwent an abdominal surgery to remove her gallbladder that was down to only nineteen percent usage. (Tr. 566). Butler also testified that she broke her knee by falling on a concrete stepping-stone and was put in a soft cast for eight weeks. *Id.* Butler stated that she still has difficulty with her knee at the time of the hearing. (Tr. 567). Butler also

testified that she underwent sinus surgery because she was getting a lot of nasal drainage and a lot of infections. *Id*. Butler stated that this helped her breathing but that she still had to do the breathing treatments. (Tr. 568). Butler stated that with all of these problems, before 2002 she could only walk for about a block. *Id*. Butler also stated that she was not able to recline while sitting, and could only sit for about ten minutes at a time before her legs lost circulation and became numb. (Tr. 568-69). Butler also testified that she was not able to sleep through the night and that she had to get up two or three times a night, not including the times that she had to get up to take her treatments. (Tr. 569-70). Butler further stated that in 2002, she could only sleep while in an Indian-style sitting position leaning over her pillows. (Tr. 570). Because Butler could not get a good night's sleep, she stated that she would take about four short naps a day that each lasted from twenty to thirty minutes. *Id*.

At the second hearing before the ALJ, Butler stated that her continuous bouts with upper respiratory infections were what caused her to not be able to work anymore. (Tr. 596). Butler also stated that in 1998 she had to take her nebulizer every four hours, and that at the time of the second hearing she was taking her nebulizers every three hours about eighty percent of the time. (Tr. 597). Butler testified that after being admitted to hospital for shortness of breath and bronchitis, Dr. Stein recommended in 2003 that she should be on oxygen continuously because her COPD had worsened. (Tr. 598-99). Butler again testified that between 1997 and 2003 she did basic housework like dusting the furniture. (Tr. 599).

In rejecting as not fully credible Butler's complaints of her inability to breathe and to do certain physical activities, the ALJ wrote:

After considering the evidence of record, the undersigned finds that the claimant's

medically determinable impairments could have been reasonably expected to produce the alleged symptoms, but that the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible.

Despite the claimant's allegations that she has been totally disabled during the relevant period under consideration, there are no objective findings or clinical signs to support those allegations. The claimant has had multiple visits to her primary care physician; however, as credibly testified to by the medical expert multiple examinations of her lungs have been clear with only mild changes noted. Physical examinations of the claimant nearing her date last insured were essentially normal with the exception of some upper respiratory symptoms, tracheitis, bronchitis, and asthma (Exhibit 11F, pages 64, 73, 75, and 77). A chest x-ray performed in April 2003 showed mild COPD with no active pulmonary disease (Exhibit 3F, page 13). Additionally, the majority of the claimant's pulmonary function tests were performed pre-bronchial dilator. Furthermore, despite the claimant's COPD condition, she continues to smoke despite being told to quit.

(Tr. 22).

It is true that the ALJ has broad discretion in evaluating the evidence of a claimant's

subjective symptoms. *Hames,* 707 F.2d at 166. However, as required by 20 C.F.R. ß 404.1529(c),

[w]hen the medical signs or laboratory findings show that you have a medically determinable impairment(s) that could reasonably be expected to produce your symptoms, such as pain, we must then evaluate the intensity and persistence of your symptoms so that we can determine how your symptoms limit your capacity for work. In evaluating the intensity and persistence of your symptoms, we consider all of the available evidence, including your medical history, the medical signs and laboratory findings, and statements from you, your treating or examining physician or psychologist or other persons about how your symptoms affect you. We also consider the medical opinions of your treating source and other medical opinions as explained in ß 404.1527.

20 C.F.R. ß 404.1529(c). 20 C.F.R. ß 404.1527 essentially states that if opinion evidence of a

claimant's disability is inconclusive, the ALJ should try to obtain additional evidence by requesting

additional existing records, recontacting treating or any other examining sources, asking a

claimant to undergo a consultative examination at the government's expense, or asking the

claimant or others for more information. Because the ALJ relied entirely on the medical opinion of

the Dr. Goldstein, and because Dr. Goldstein admitted that he lacked sufficiently detailed medical

records to make a conclusive disability determination, the ALJ had a duty to obtain additional

medical evidence before discounting Butler's testimony of her symptoms as not entirely credible.
Because Butler had pre-bronchodilator FEV1 levels that met the listing before and after the
relevant period, and because Butler was diagnosed multiple times during the relevant period with
COPD, the ALJ should have sought out additional information clarifying the severity of Butler's
COPD. Doing so would likely have supplied the "objective findings or clinical signs to support [or
refute] those allegations" that the ALJ claimed were missing. Additionally, Butler's numerous
diagnoses of hypertension and asthma during the relevant period lend support to her claims of
subjective inability to breathe after minimal exertion, and her inability so sit or stand continuously
for even short periods of time (Tr. 22). Finally, the ALJ mentions that Butler continued to smoke
despite her COPD diagnoses. It is not clear what the ALJ implied this to mean. However, it
should be noted that there is no objective medical evidence in the form of either signs or
laboratory findings that would conclusively indicate how Butler's smoking affected her COPD,
asthma, or hypertension. 20 C.F.R. ß 404.1529(a). The medical records only contain
recommendations from Butler's physicians advising her to stop smoking, and documentation of
whether or not Butler was still smoking at the time of her examinations. These factors weigh
against the ALJ's finding that Butler's claims of subjective pain and disability were not credible.

**D. Education, Work History and Age**

The fourth element considered is the claimant's educational background, work history and
present age. A claimant will be determined to be disabled only if the claimant's physical or mental
impairments are of such severity that he is not only unable to do his previous work, but cannot,
considering his age, education, and work experience, engage in any other kind of substantial
gainful work which exists in the national economy. 42 U.S.C. ß 423(d)(2)(a).

The record shows that Butler was fifty-five years old on the date of the hearings before the ALJ, completed the ninth grade and later obtained a GED, and had past work experience as a cashier, pawn shop clerk, and toll booth operator. (Tr. 86, 558, 595). Based on the ALJ's conclusion that Butler had the residual functional capacity to perform light work "in a clean environment free from fumes, odors, dusts, gases, and poor ventilation, no overhead work, and avoidance of climbing and heights," the ALJ questioned a vocational expert to determine whether Butler could perform any of her past work, and if not, whether she could perform any other work that exists in significant numbers in the national economy. (Tr. 20). In each hypothetical the ALJ posed to the VE, the ALJ asked if the hypothetical claimant would be able to perform "light" work. (Tr. 574, 575, 576, 618). However, the two pulmonary questionnaires completed by Dr. Stein and the one pulmonary questionnaire completed by Dr. Goodine suggest that Butler would actually be at the sedentary level. Sedentary work is defined as:

> [L]ifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. § 404.1567(a). Dr. Stein answered in the first questionnaire that Butler, in a competitive work situation, would never be able to carry even less than ten pounds. (Tr. 418). Dr. Stein's second questionnaire stated that on both an occasional and frequent basis Butler's recommended maximum ability to lift and carry would be "less than 10#." (Tr. 537). Dr. Goodine, in her pulmonary impairment questionnaire, stated that Butler's recommended maximum ability to lift and carry on a frequent basis was also "less than 10#." (Tr. 539). Therefore, based on both Dr. Stein and Dr. Goodine's opinions, Butler should have been evaluated on the criteria of sedentary work instead of light work.

Prior analysis has demonstrated that the ALJ erred in rejecting both Dr. Stein's expert opinion as well as Dr. Goodine's medical opinion in favor of adopting the ME's inconclusive, non-expert medical opinion. Therefore, it follows that the ALJ erred in posing hypothetical questions to the VE that assumed that Butler could undertake light work. When the ALJ did pose a hypothetical to the VE based on Dr. Stein's first questionnaire that found Butler to only be capable of sedentary work, the VE stated that Butler would not be able to do any of her past relevant work or any other job, and would be precluded from all competitive employment (Tr. 418, 618-19). Therefore, had the ALJ based his questioning on the records and medical opinions of Dr. Stein and Dr. Goodine, as this analysis has concluded he should have, the ALJ would have found that Butler was not able to perform her past relevant work or any other job. This factor does not support the ALJ's decision.

## VI. Conclusion and Order

Considering the record as a whole, the undersigned is of the opinion that the ALJ did not properly use the guidelines propounded by the Social Security Administration and did not comply with the order of the Appeals Council. *See Rivers v. Schweiker*, 684 F.2d 1144 (5th Cir. 1982). As the relevant factors do not weigh in support of the ALJ's decision, and as the ALJ did not use the correct legal standards, the Court ORDERS that Plaintiff's Motion for Summary Judgment (Document No. 11) is GRANTED, Defendant's Motion for Summary Judgment (Document No. 13) is DENIED, and the decision of the Commissioner be REVERSED and REMANDED for further proceedings consistent with this memorandum and order.

Signed at Houston, Texas, this 2nd day of July, 2008.

Frances H. Stacy
United States Magistrate Judge